UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
JANICE WILLIAMS,

                                    Plaintiff,

                    -against-                                           20-CV-5991 (VF)

KILOLO KIJAKAZI,                                                **OPINION & ORDER**
Acting Commissioner of Social Security,

                                    Defendant.
----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 12/5/2022 __

**VALERIE FIGUEREDO, United States Magistrate Judge**

        Plaintiff Janice Williams brings this action seeking judicial review of a final determination

by Defendant, the Acting Commissioner ("Commissioner") of the Social Security Administration

("SSA"),[1] denying Plaintiff's applications for Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act (the "Act") and disability insurance benefits ("DIB") under Title II

of the Act, based on a finding that she is not disabled for purposes of entitlement to SSI or DIB.

Before this Court is the Commissioner's motion for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure, and Plaintiff's cross-motion to remand. For the

reasons set forth below, Plaintiff's motion is **GRANTED**, and the case is **REMANDED** for further

administrative proceedings.[2]

_____

        [1] On July 9, 2021, Kilolo Kijakazi became Acting Commissioner of the SSA, and is
therefore substituted as named defendant. See Fed. R. Civ. P. 25(d) (permitting automatic
substitution of a party who is a public official sued in his official capacity when the public
official "ceases to hold office" while a suit is pending).

        [2] Because the Court is ordering that this case be remanded, the Commissioner's motion
for judgment on the pleadings is denied.

**BACKGROUND**

**A.  Procedural History**

On September 21, 2017, Plaintiff filed an application for SSI and DIB. SSA Administrative Record ("R.") at 21, 88, 178-88, 195-96 (ECF No. 16). Plaintiff applied for SSI and DIB benefits following a back injury she sustained in 2015, at the age of 36, during the course of her employment as a hospital linen-room attendant. Id. at 21, 46-48, 55-56, 248; Def.'s Br. at 1, ECF No. 23. At her hearing before the administrative law judge, Plaintiff testified that she also suffers from obesity and depression. R. at 43-67. Plaintiff alleged that these mental and physical impairments prevented her from working since October 16, 2016, the onset date of her disability. Id. at 21, 195. Plaintiff's claims for SSI and DBI benefits were denied on November 29, 2017, and on December 11, 2017, Plaintiff filed a written request for a hearing before an administrative law judge. Id. at 21, 88-89, 110-129. On April 16, 2019, Plaintiff appeared before Administrative Law Judge Denise M. Martin (hereinafter, the "ALJ"), accompanied by counsel. Id. at 20-21, 43-67.

On May 28, 2019, the ALJ issued a written decision, denying Plaintiff's claim and finding that Plaintiff has not been under a disability within the meaning of the Act from October 16, 2016, to the date of the decision. Id. at 18-31. Plaintiff requested a review by the SSA Appeals Council on July 1, 2019, which was denied on May 20, 2020. Id. at 1-5, 177. That denial made the May 28, 2019 decision of the ALJ the final action of the Commissioner. See Lesterhuis v. Colvin, 805 F. 3d 83, 87 (2d Cir. 2015) (per curiam) ("If the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision.") (citation omitted).

After exhausting her administrative remedies, Plaintiff commenced the instant action seeking judicial review of the ALJ's decision. See ECF No. 5 at 2.[3] On November 8, 2021, the

---

[3] On July 21, 2020, Plaintiff filed her initial complaint. ECF No. 2. On September 29, 2020, Plaintiff filed an amended complaint. ECF No. 5. On October 14, 2021, the parties consented to the

Commissioner filed the Administrative Record, which constituted her answer. ECF No. 16.

Thereafter, on March 11, 2022, the Commissioner moved for judgment on the pleadings and

submitted a memorandum of law in support of her motion, requesting that the Court affirm the

ALJ's decision. ECF Nos. 22-23. On October 5, 2022, Plaintiff submitted her opposition and cross-

motion, seeking a remand for a *de novo* hearing to allow the ALJ an opportunity to consider new

medical and psychiatric evidence. ECF Nos. 38-39. On October 26, 2022, the Commissioner filed

its opposition to Plaintiff's motion and reply in support of its own motion. ECF No. 44. On

November 18, 2022, the Court held oral argument on the parties' motions. See ECF No. 48

("Hearing Tr.").

   **B.  The Hearing Before the ALJ**

   The hearing was held before ALJ Denise Martin on April 16, 2019. R. at 43. Plaintiff was

accompanied by counsel, William Aronin; Vocational Expert ("VE") Tricia Muth was also present

at the hearing. Id. at 43, 45. At the start of the hearing, Plaintiff's counsel explained that there were

"not a lot of records" available because, for instance, the workers' compensation insurance would

not "approve the MRI of [Plaintiff's] thoracic spine," and would not cover "further treatment or

even diagnostic[s]" beyond her "lumbar pre-onset." Id. at 46. Plaintiff's counsel further stated that

Plaintiff has had "radiating pain" for an "extended period of time" and has "constantly

complain[ed] about back pain, [and] difficulty with sitting." Id. at 47.

   At the time of the hearing, Plaintiff was 39 years old, single, and lived with her four

children, who at the time of the hearing were between the ages of 13 and 20. Id. at 48, 54. Plaintiff

testified that she has a bachelor's degree, and worked as a math and reading tutor for children at a

local community center while she was in college. Id. at 48, 56. After college, Plaintiff worked at a

_____

magistrate judge's jurisdiction for all proceedings and the entry of final judgment, in accordance
with 28 U.S.C. § 636(c). ECF Nos. 14-15.

hospital as a linen-room attendant. Id. at 48, 55. There, Plaintiff injured her back while lifting and

pushing a heavy bin. Id. As a result of the injury, Plaintiff received worker's compensation. Id. at

46, 48, 248. Plaintiff testified that she had "worked [her] entire life" until this injury. Id. at 52-53.

After her injury, Plaintiff began working as a Medicaid Service Coordinator. Id. at 48. In

that role, Plaintiff was required to work both sitting at a desk and standing on her feet while "in the

field." Id. at 48-49. Plaintiff testified that her boss would get frustrated with her because she

"couldn't sit long enough to . . . make the phone calls that [were] necessary." Id. at 49. Plaintiff

testified she can only sit for approximately 15 minutes, and that when she sits for too long, she

starts to either get spasms or sharp pains on her "left side." Id. She explained that while sitting she

tries to "readjust" and "find a spot" that is comfortable, but that it is "very difficult" for her to sit

"for a long period of time." Id. at 49-50. When asked by the ALJ if she thought there was "any type

of job [she] can do," Plaintiff testified that she is frustrated by the fact that she cannot work, but did

not "see anything that [she] really physically can do." Id. at 53.

Plaintiff testified that her back pain "starts at the top of [her] neck and then [ ] goes down to

the center of [her] back." Id. at 50. The ALJ noted that Plaintiff was wearing a back brace; Plaintiff

testified that it was prescribed to her and she wears it "primarily during the day." Id. Plaintiff

testified that she also has difficulty standing for longer than about 20 minutes, because "it feels like

[her] hip is giving out" and causes pain that "radiate[s] from the top" and "shoot[s] up." Id. at 50,

59. Plaintiff stated that she has difficulty using stairs, and that her pain caused her to fall down the

stairs at her home a few months prior to the hearing. Id. at 50-51. Plaintiff testified that she does

not use a cane because she was never prescribed one. Id. at 51. Plaintiff further testified that she

saw a doctor in December 2018, who diagnosed her with sciatica in her back and prescribed her

with pain medication, but that the medication has not helped. Id. at 52-53. Plaintiff was also given a

referral for physical therapy but her appointment was not until after the hearing, in May 2019,

"because the list [was] so long." Id. at 53. When asked how much Plaintiff could lift, she responded "a half gallon of milk maybe." Id. at 60.

Plaintiff stated that she had been taking her 13-year-old son to school, but could no longer do so because getting on and off the bus was difficult. Id. at 51-52. When asked about her ability to care for her four children, Plaintiff stated that her kids have "stepped in a lot to help [her] with preparing meals or just [her] daily needs," and that they "work their schedule around [her] because they know [she] need[s] help." Id. at 52. Plaintiff testified that she is unable to cook, shop for groceries, wash dishes, or do laundry and other household chores without the help of her children. Id. at 58. Plaintiff is able to bathe and dress herself, except that her daughters help her with her shoes. Id. at 58-59. Plaintiff testified she used to socialize with friends and family, but does not do so anymore and is unable to attend her childrens' school functions. Id. at 59.

At the time of the hearing, Plaintiff was receiving psychiatric treatment from Montefiore, and testified that the "first 2-3 times [she] went there," she only talked about her back pain. Id. at 53-54. Plaintiff testified that she takes medication for depression, which stems from her inability to function normally, including going out, seeing friends and family, and taking care of her children. Id. at 57. Plaintiff testified that she has been in counseling once per week since March 2019, but that counseling and medication had not "really" helped with her depression. Id. at 57-58.

The ALJ then posed various hypotheticals to the VE. Id. at 61-63. First, the ALJ asked the VE to assume:

> [A] hypothetical individual the same age, education, and work experience as the claimant who is limited to light work. No climbing of ladders, ropes, and scaffolds. Occasional ramps and stairs, balance, stoop, kneel, crouch, crawl. Avoid exposure to unprotected heights and dangerous moving machinery. Unskilled, simple, routine repetitive job. Occasional interaction with coworkers, supervisors. No fast-paced or production quotas.

Id. The VE testified that such an individual could not do Plaintiff's past work. Id. at 60-61. The ALJ asked the VE whether there would be any other jobs in the national economy that would accommodate the limitations in the hypothetical, and the VE responded that such an individual could work as a (1) small parts assembler; (2) inspector, hand packager; and (3) mail clerk. Id. at 61. The ALJ then amended the hypothetical to add that Plaintiff "would be limited to no kneel, crouch, crawl"—with all other limitations remaining the same—and asked the VE whether Plaintiff could still perform the three jobs identified by the VE, or other jobs. Id. The VE testified that such a hypothetical individual could still perform those three jobs. Id.

The ALJ then asked whether there would be any work for an individual if that same person was limited to "sedentary" work and also could not "kneel, crouch, crawl." Id. at 62. The VE responded that such a hypothetical person could be employed as a (1) document preparer; (2) check weigher; and (3) final assembler. Id. The ALJ asked whether there would be any work if the hypothetical person had to "alternate between sitting and standing every hour." Id. The VE responded that such a person could no longer be a mail clerk because there "is no option for sit/stand in that position," but such a person could still be a small parts assembler, inspector hand packager, and laundry folder. Id. at 62-63. The VE also testified that a sit/stand option would not impact the sedentary jobs (*i.e.*, document preparer, check weigher, and final assembler). Id. at 63. Lastly, the VE testified that all the jobs identified were consistent with those found in the Dictionary of Occupational Titles. Id.

## C. Medical and Non-Medical Evidence

1. Plaintiff's Back Injury

  i. Evidence Available at Plaintiff's Hearing Before the ALJ

Plaintiff alleges that she has suffered from severe neck and back pain since August 27, 2015, when she was injured pushing a heavy bin while working as a hospital linen-room attendant. R. at 46, 48, 55, 248. Plaintiff was examined on September 17, 2015, by a state agency orthopedic surgeon, Dr. David Shein, in connection with Plaintiff's worker's compensation case. Id. at 248. Dr. Shein noted that Plaintiff complained of pain in her lower back, neck, and left shoulder, but that her treatment was limited to her lower back because the worker's compensation case was "only open for the lumbar spine." Id. Dr. Shein observed that Plaintiff's pain "radiates into the proximolateral aspect of her left thigh" and that Plaintiff had a slightly reduced range of motion in her lower back and "exquisite tenderness centrally over the lumbosacral junction." Id. at 248-49. Dr. Shein also observed Plaintiff had a "well maintained" gait, could walk on her tiptoes and heels, and could squat and return to a standing position. Id. at 249. Dr. Shein determined that Plaintiff was "unfit to return to work," prescribed rest and a "lumbar corset," and ordered an MRI of Plaintiff's lumbar spine. Id.

Plaintiff returned to Dr. Shein on October 21, 2015, complaining of ongoing severe pain in her neck "as well as radiation of pain into the left shoulder." Id. at 250. Dr. Shein reported that testing of Plaintiff's cervical spine (neck) was not approved by her worker's compensation, but that he wanted to examine her cervical spine as soon as it became covered. Id. An MRI of Plaintiff's lumbar spine (lower back area) showed "the presence of facet arthropathy," "very subtle bulges," and "central canal stenosis" at the L4-L5 segment.[4] Id. at

---

[4] Despite this notation, Dr. Shein's report also states that "there is no central canal stenosis." See R. at 250.

250, 288, 298. Dr. Shein again determined that Plaintiff was "unfit to return to work." Id. at 250. During the examination, Plaintiff showed a normal gait, full motor strength, and normal reflexes in her lower extremities. Id.

On December 28, 2015, Dr. Shein diagnosed Plaintiff with a sprain of ligaments in her lumbar spine, a sprain to her lumbar spine, facet arthropathy, and bulging in the lumbosacral region "with central canal stenosis." Id. at 288. He again found Plaintiff unfit to return to work, and noted that she "require[d] further testing imaging." Id. at 288-89. Dr. Shein prescribed Plaintiff a back brace for "injury of [the] nerve root of [her] thoracic spine" (upper-back). Id. at 294.

Plaintiff was treated for back pain on January 15, 2016, by Dr. Elizabeth Mathew. Id. at 283-84. Plaintiff reported upper back and neck pain as a result of her workplace injury. Id. Dr. Mathew observed that Plaintiff showed lumbar spine tenderness, spasms, trigger points in her lower back region, mid-spine tenderness, and tendinitis on the left side. Id. Dr. Mathew also observed that Plaintiff had 4/5 strength in lower extremities, intact sensation, normal reflexes, was neurologically intact, and showed "negative straight leg raising." Id. Dr. Mathew diagnosed Plaintiff with radiculopathy in the lumbosacral region. Id. at 283-86.

On March 25, 2016, Plaintiff was treated by state agency orthopedic consultant Dr. John Denton, who diagnosed Plaintiff with a lumbar spine strain. Id. at 280-81.

Dr. Shein again treated Plaintiff for pain in her cervical spine on January 3, 2017. Id. at 266. At that examination, Plaintiff reported having difficulty with "all activities of daily living," including lifting, pushing, sleeping, and overhead maneuvers. Id. Dr. Shein observed that Plaintiff had "multiple trigger points" over the left trapezius muscle in her back, but normal gait, full motor strength, and intact reflexes. Id. Dr. Shein once again found Plaintiff unfit for work. Id. He ordered an MRI and X-ray of Plaintiff's cervical spine and physical

therapy. Id. However, neither were covered by Plaintiff's worker's compensation and thus Plaintiff could not receive the testing or physical therapy. Id.

At an April 27, 2017 examination, Plaintiff reported to Dr. Shein that her pain had spread from her upper back and neck to her mid-back, and she also reported that she had been stumbling while walking more often. Id. at 258. Dr. Shein reported full extremity strength, intact reflexes, and observed multiple trigger points, tenderness in the thoracic spine, and spasm. Id. Dr. Shein diagnosed Plaintiff with a herniated thoracic disc. Id. at 258, 260. Dr. Shein noted that Plaintiff's spinal cord could be "compromise[d]" and ordered an MRI of Plaintiff's thoracic spine.[5] Id. at 258. Dr. Shein prescribed Plaintiff Vicodin for her back pain and also recommended physical therapy. Id. at 259, 271. Dr. Shein opined that Plaintiff was unfit to work and should avoid lifting, pushing, and carrying heavy objects. Id. at 259.

On July 20, 2017, Plaintiff reported to Dr. Shein that she was experiencing "excruciating pain in[ ] her lower back," "discomfort in[ ] the thoracic spine," a feeling that her hip was "coming out of place," and difficulty standing due to her pain. Id. at 271. Dr. Shein observed that Plaintiff had "exquisite tenderness throughout her spine and palpable muscle spasm." Id. Dr. Shein observed that Plaintiff's gait was slow and tardy, and that she had full strength in the upper extremities. Id. Dr. Shein prescribed a thoracic-lumbar-sacral brace, and Percocet for Plaintiff's back pain. Id. Dr. Shein noted that he had requested an MRI of Plaintiff's thoracic spine, which Plaintiff had not yet received because it was not approved by her workers' compensation. Id.

Plaintiff again saw Dr. Shein on August 3, 2017, and reported "excruciating burning" and a "jolting sensation" in her back. Id. at 263. Plaintiff also reported loss of balance while

_____

[5] At the hearing before the ALJ, Plaintiff's counsel explained that Plaintiff's workers' compensation insurance would not "approve the MRI of [Plaintiff's] thoracic spine." Id. at 46.

walking, and falling due to sharp pain. Id. Dr. Shein observed that Plaintiff had tenderness "over the left periscapular area," trigger points, and spasm, but a normal gait, an ability to walk on toes and heels, and normal reflexes. Id. Dr. Shein again noted that Plaintiff's spine might be compromised and requested an MRI. Id. Dr. Shein changed Plaintiff's prescription, referred her to a pain specialist, and stated that Plaintiff remained unfit for work. Id. Dr. Shein completed a Treating Physician's Wellness Plan Report on August 11, 2017, where he diagnosed Plaintiff with disc degeneration in the thoracic spine and "other intervertebral disc displacement." Id. at 307-08. Dr. Shein noted that Plaintiff was "[t]emporarilly unemployable." Id. at 308.

Plaintiff underwent a consultative internal medicine examination on October 30, 2017, performed by Dr. Carol McLean Long. Id. at 302-05. At the examination, Plaintiff reported back pain that prevented her from sleeping, cooking, cleaning, and dressing herself, but that she was able to prepare microwavable meals, shop, and occasionally socialize with friends. Id. at 302-03. Plaintiff reported that she had been taking medication and planned to start physical therapy soon. Id. at 302. Dr. Long observed reduced ranges of motion in Plaintiff's lumbar spine, cervical spine, shoulders, hips, and knees, and no abnormality in the thoracic spine. Id. at 304. Dr. Long noted that Plaintiff's straight-leg raise was positive on the left side. Id. An X-ray of Plaintiff's lumbosacral spine showed straightening, but was otherwise normal. Id. at 305-06. Dr. Long observed that Plaintiff had a mild to moderate limitation in her ability to walk, squat, reach up and out, and flex and extend her spine. Id. at 305.

On November 28, 2017, a state agency medical consultant, Dr. R. Abueg, conducted a review of Plaintiff's medical records and other evidence and found that Plaintiff could occasionally lift and/or carry up to 20 pounds; could frequently lift and/or carry up to 10 pounds; could never climb ramps, stairs, ladders, ropes, or scaffolds; and could never kneel,

crouch, or crawl. Id. at 69-70, 73. Dr. Abueg also found that Plaintiff could sit for six hours

during an eight-hour work day, and she could stand and/or walk for up to three hours a day. Id.

at 73.

On December 19, 2018, Plaintiff saw Dr. Galina Glazman-Kuczaj for an annual exam.

R. at 331. Plaintiff reported that medication only provided temporary relief for her back pain.

Id. A physical exam yielded normal results, including negative straight leg raising and

unremarkable neurological findings, except for tenderness in the thoracic midline. Id. at 333.

Dr. Glazman-Kuczaj recommended that Plaintiff use a heating pad and attend physical

therapy. Id. 334.

ii.   New Medical Evidence

On August 9, 2021, after receiving workers' compensation coverage for testing and

examinations of her upper spine including the cervical (neck) region, Dr. Amichai Erdfarb

reviewed an MRI of Plaintiff's cervical spine. See Decl. of Julia M. MacAllister, dated

October 5, 2022, Ex. A at 20, ECF No. 40 ("MacAllister Decl."). The MRI of Plaintiff's

cervical region showed "moderate spinal canal stenosis." Id. The stenosis at spinal segment

C5-C6 was "[b]road-based, left eccentric, disc osteophyte complex, effacing the ventral CSF

space, [and] flattening the ventral margin of the spinal cord." Id. The MRI showed

"degenerative disc desiccation," "mass effect exerted on the ventral spinal cord," and

straightening of the cervical lordosis that could be "positional and/or reflect paraspinal muscle

spasm." Id. at 19. At C3-C4, the MRI showed "[c]entral disc protrusion . . . mildly narrowing

the spinal canal, and indenting [of] the ventral margin of the spinal cord." Id. Dr. Erdfarb

observed "left paracentral disc protrusion" mildly narrowing the spinal canal at C4-C5. Id. at

19-20. Dr. Erdfarb also reviewed an MRI of Plaintiff's thoracic spine, which showed "[l]eft

asymmetric posterior ligamentous hypertrophy at T10–T11, mildly narrowing the spinal canal and flattening the posterior lateral margin of the left hemicord." Id. at 21.

Dr. Andrew McClelland evaluated Plaintiff on September 3, 2021. Id. at 16-17. A CT scan of Plaintiff's cervical spine showed spinal canal stenosis with myelopathy and multilevel degenerative change. Id. at 16.

Dr. Robin Cohen evaluated Plaintiff on September 14, 2021. Id. at 14-15. An X-ray of the cervical spine showed "[m]ild straightening with mild degenerative-type changes at C5/C6." Id. at 14.

Plaintiff had a telehealth appointment with neurosurgeon Yaroslav Gelfand on January 11, 2021. Id. at 97-100. Dr. Gelfand reported that Plaintiff had a "history of cervical generative disc disease" and was presenting "recurring pain primarily in her neck, radiating down her mid back." Id. Dr. Gelfand prescribed physical therapy and pain management for Plaintiff. Id. at 100.

2. Plaintiff's Mental Impairments

i. Evidence Available at Plaintiff's Hearing Before the ALJ

Plaintiff underwent an initial mental-health assessment for depression on March 15, 2019, with Licensed Master Social Worker Kuburat Ibukunle at Montefiore Medical Center. R. at 309-11. Plaintiff reported worsening depression and social isolation related to her chronic back pain, and that since her workplace injury, she has "just loung[ed] around" and relied on her children for help with daily household chores. Id. at 309. Ibukunle described Plaintiff as "well groomed and well related," but "depressed," with low risk for suicide and self-harm. Id. at 311. She ordered a psychiatric evaluation. Id.

Plaintiff underwent an evaluation on March 28, 2019, with Nurse Practitioner Elisabeth J. Maher at Montefiore. Id. at 317-21. Plaintiff reported depression, sadness, irritability,

explosive anger, anxiety, self-isolation, racing thoughts, trouble concentrating, and lack of energy. Id. at 317. Plaintiff explained that, although she had "been this way for a while," her condition had deteriorated. Id.

Maher conducted a mental-status examination, and described Plaintiff as having a mood disorder with symptoms of hopelessness, anxiety, and insomnia. Id. at 318. Maher also reported that Plaintiff was well groomed, "superficially cooperative," and calm, with normal speech, a euthymic mood, a flat aspect, unremarkable thought content, intact cognition, intact memory, intact attention, intact concentration, full orientation, no suicidality, good insight and judgment, and intact impulse control. Id. at 320. Maher diagnosed Plaintiff with major depressive disorder, recommended continued therapy, and prescribed medication for depression and anxiety. Id. at 317, 320-21. Maher noted that Plaintiff had no history of psychiatric hospitalization and had never been prescribed psychiatric medication. Id. at 317.

Plaintiff had a psychotherapy session with Ibukunle on March 28, 2019, where Plaintiff reported worsening back pain (and that her medication was not helping), daily depression, irritability, and "spik[ing]" anxiety causing her to "feel erratic at times." Id. at 312. Plaintiff explained that her depression causes her to not want to engage with her children or others. Id. Ibukunle performed a mental-status exam and described Plaintiff as having a depressed mood and "flat affect," but also as well-groomed and cooperative, with appropriate behavior, normal speech, a concrete thought process, unremarkable thought content, intact cognition, full orientation, intact memory, intact attention, intact concentration, average intelligence, good insight and judgment, and intact impulse control. Id. at 314-15.

Plaintiff had an examination on December 19, 2018, performed by Dr. Glazman-Kuczaj. Id. at 331. Plaintiff reported anxiety, but that she was not on medications and did not

13

see a psychiatrist. Id. at 331. Dr. Glazman-Kuczaj provided Plaintiff with a psychiatry referral. Id. at 334.

ii.   New Psychiatric Evidence

Since beginning psychiatric treatment on March 15, 2019, Maher and a Montefiore social worker have treated Plaintiff two-to-three times a month for her diagnosed major depressive disorder and other mental health disorders. See MacAllister Decl., Ex. A at 36-38, 79-84. Plaintiff was diagnosed with bipolar II disorder on April 25, 2019, post-traumatic stress disorder on November 11, 2019, and borderline personality disorder on February 20, 2020. Id. at 79-84, 86, 95. Her medical records show that she continues to be treated for these conditions. Id. Since the ALJ hearing in April 2019, Plaintiff has been prescribed multiple psychiatric drugs. Id. at 2, 39, 88-93.

**DISCUSSION**

A. **The ALJ's Decision**

On May 28, 2019, the ALJ issued a decision finding that Plaintiff "has not been under a disability within the meaning of the Social Security Act from October 16, 2016, through the date of this decision." R. at 22. The ALJ began by explaining the five-step evaluation process for determining whether an individual is disabled. Id. at 22-23.

As a threshold matter, the ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2019. Id. at 23. At step one, the ALJ found that Plaintiff had "not engaged in substantial gainful activity" since the date of her application. Id. The ALJ noted that Plaintiff had "worked after the alleged disability onset date but this work activity did not rise to the

14

level of [substantial gainful activity]."[6] Id. At step two, the ALJ found that Plaintiff had three

severe medically determinable impairments—lumbar facet arthropathy with lumbar straightening,

obesity, and major depressive disorder. Id. At step three, the ALJ found that Plaintiff "does not

have an impairment or combination of impairments that meets or medically equals the severity of

one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." Id. at 24. The ALJ

discussed Plaintiff's physical impairments (obesity and the spinal injury) and explained why she

concluded that the severity of each impairment did not meet the corresponding listing (including

listing 1.04A for Plaintiff's alleged spinal impairment). Id.

In assessing Plaintiff's major depressive disorder, the ALJ found that the severity of that

mental impairment "does not meet or medically equal the criteria for any of listing 12.04" (the

mental impairment listing). Id. In order to reach this finding, the ALJ applied evidence in the

record to each of the four broad functional areas (known as "paragraph B" criteria), including: (1)

understanding, remembering, or applying information; (2) interacting with others; (3)

concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. Id. at 24-25.

The ALJ found Plaintiff's limitations to be "moderate" for each category and concluded that

"[b]ecause the [Plaintiff]'s mental impairments do not cause at least two 'marked' limitations or

one 'extreme' limitation, the 'paragraph B' criteria are not satisfied." Id. at 25.

Prior to proceeding to step four, the ALJ found, "[a]fter careful consideration of the entire

record," that Plaintiff maintained "the residual functional capacity [("RFC")] to perform light work

as defined in 20 C.F.R 404.1567(b) and 416.967(b)," with some exceptions.[7] Id. at 25. The ALJ

---

[6] The ALJ explained that earnings statements showed that Plaintiff had earned $13,989 in 2018 from self-employment, but that the amount was "under the 2018 yearly [substantial gainful activity] level of $14,160." R. at 23.

[7] The exceptions were that Plaintiff could "use a sit/stand option every 60 minutes," "never kneel, crouch, crawl, or climb ladders, ropes or scaffolding," and "occasionally climb ramps and

explained that in making the RFC finding, she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and "also considered the medical opinions and prior administrative medical findings," as required by 20 C.F.R. 404.1520(c) and 416.92(c). Id. at 26. In considering Plaintiff's symptoms, the ALJ followed the established two-step process: (1) determining "whether there were underlying medically determinable physical or mental impairments . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) if such an impairment was shown, evaluating the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." Id.

The ALJ analyzed Plaintiff's impairments and, after considering the medical records and other evidence, found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] only partially consistent with the entire record." Id. at 26-27. The ALJ concluded that "the objective findings support some restrictions, but not to the degree alleged" by Plaintiff, reasoning that "[Plaintiff]'s longitudinal medical history shows treatment that has been infrequent and extremely conservative" and that "[i]f the [Plaintiff]'s impairments were as severe as alleged, it is reasonable to assume the [Plaintiff] would continue to seek additional treatment." Id. at 27. The ALJ also independently evaluated each of the various medical opinions and prior administrative medical findings, and determined the level of persuasiveness for each based on an analysis of the "supportability" and "consistency" factors. Id. at 27-28. The ALJ stated that in considering "[t]he objective findings, statements of the [Plaintiff], and opinion evidence from

---

stairs, balance and stoop." R. at 25. The RFC also provided that Plaintiff would need "to avoid all exposure to unprotected heights and dangerous moving machinery," but that she could "perform unskilled simple, routine, and repetitive tasks that are not fast-paced and do not have production quotas." Id. Finally, the RFC provided that Plaintiff could "occasionally interact with the general public, coworkers, and supervisors." Id.

medical and other sources" and "the limitations caused by [Plaintiff]'s impairments," Plaintiff maintained the ability "to perform a reduced range of light work." Id. at 28. The ALJ explained how each of the exceptions provided for in the RFC determination accounted for Plaintiff's limitations. Id.

At step four, the ALJ found that Plaintiff was "unable to perform any past relevant work." Id. at 28-29. At step five, the ALJ considered Plaintiff's "age, education, work experience, and residual functional capacity," and found that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." Id. at 29. Based on the testimony of the VE and the Medical-Vocational Guidelines, the ALJ concluded that a finding of "not disabled" was appropriate because Plaintiff retained the residual functional capacity to perform certain work. Id. at 30. Specifically, the ALJ cited the VE's testimony that a person with Plaintiff's age, education, work experience, and RFC would be able to perform "light" work as a small-parts assembler, inspector/hand packager, or laundry folder, and "sedentary" work as a document preparer, check weigher, and final assembler.[8] Id. at 30. Accordingly, the ALJ concluded that Plaintiff "has not been under a disability" as defined in the Act, "since October 16, 2016, through the date of this decision." Id. at 30-31 (citing 20 CFR 404.1520(g) and 416.920(g)).

**B. A Remand is Warranted For Consideration by the ALJ of New Medical Evidence.**

In support of her motion for judgment on the pleadings, the Commissioner argues that the ALJ's decision applied the correct legal standard and was supported by substantial evidence. See Def.'s Br. at 12-25, ECF No. 23. Plaintiff counters that a remand is appropriate so that the ALJ may consider new medical evidence concerning her physical and mental impairments. See Pl.'s Br. at 12-23, ECF No. 39. Plaintiff points to two categories of additional evidence that she argues

---

[8] The ALJ also noted that she found the VE's testimony was "consistent with the information contained in the [Dictionary of Occupational Titles]." R. at 30.

should be considered and was not available at the time the ALJ rendered her decision: (1) MRI and CT scan testing of her cervical and thoracic spinal regions, and corresponding medical opinions, and (2) mental-health treatment, diagnoses, and psychiatric drug prescriptions. See Pl.'s Br. at 8-10, 14-19. For the reasons that follow, the Court agrees with Plaintiff that the medical evidence pertaining to her cervical and thoracic regions is material new evidence relevant to her back injury, for which a remand is warranted so that the ALJ may consider that evidence in assessing whether Plaintiff is disabled. And as the parties acknowledged at oral argument (see Hearing Tr. at 30-31, 36-38, 40), Plaintiff at a new hearing will be able to put before the ALJ her new evidence concerning her mental-health treatment. As such, the Court does not reach the issue of whether the psychiatric evidence is new evidence that supports a remand. Finally, because the case is remanded to the ALJ for further proceedings, the Court does not reach the issue of whether the ALJ's determination is supported by substantial evidence.

Generally, "evidence not contained in the administrative record may not be considered [by a district court] when reviewing the findings of the Commissioner." Brown v. Barnhart, 02-CV-4523 (SHS), 2003 WL 1888727, at *10 (S.D.N.Y. Apr. 15, 2003) (citations omitted), aff'd, 85 F. App'x 249 (2d Cir. 2004). A district court may remand a case to allow additional evidence to be considered by the Commissioner, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Additional evidence warrants a remand where (1) it is new and not merely cumulative of what is already in the record; (2) there is good cause for the failure to incorporate the evidence into the record in prior proceedings; and (3) the evidence is material. See Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004); Lisa v. Sec'y of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991); Lugo v. Berryhill, 390 F. Supp. 3d 453, 458-59 (S.D.N.Y. 2019).

**1. Plaintiff's evidence concerning her alleged spinal impairments is new, not cumulative, and Plaintiff has shown good cause for failing to have introduced it at the hearing.**

Evidence is "new" if it has not been considered previously and is "not merely cumulative of what is already in the record." Flanigan v. Colvin, 21 F. Supp. 3d 285, 308 (S.D.N.Y. 2014) (quoting Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991)). Here, the evidence concerning Plaintiff's spinal injury is new and not cumulative of the evidence that was before the ALJ. The additional evidence Plaintiff points to consists of testing (MRIs and a CT scan) and subsequent reports regarding her cervical (neck) and thoracic (upper-spine) regions. See MacAllister Decl., Ex. A at 16-20, 61-67, 97-100. Although Plaintiff had frequently reported pain in her neck and upper-back during the relevant period, her workers' compensation did not cover testing or treatment of that region, and thus the medical evidence before the ALJ pertaining to Plaintiff's spine concerned her lumbar (lower-back) region. R. at 21, 46-56, 248-250, 258, 266, 271, 283. The additional evidence was therefore not available at the time of the ALJ's determination. See Mendez ex rel. E.V. v. Astrue, No. 11-CV-4297 (KAM), 2013 WL 1686485, at *9 (E.D.N.Y. April 18, 2013) (finding medical records related to claimant's condition were not cumulative because they were not available prior to the time the administrative record was closed).

In addition, Plaintiff has shown good cause for not having obtained this evidence earlier. See Rolon v. Comm'r of Soc. Sec., 994 F. Supp. 2d 496, 509 (S.D.N.Y. 2014) (citing 42 U.S.C. § 405(g)) (explaining that a remand requires a showing of "good cause for the failure to incorporate [additional] evidence into the record in a prior proceeding"); Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988). Good cause exists where the evidence "surfaces after the Secretary's final decision and the [Plaintiff] could not have obtained the evidence during the pendency of [the prior] proceeding." Carter v. Colvin, No. 14-CV-4970 (JG), 2015 WL 5124326, at *10 (E.D.N.Y. Sept. 1, 2015) (quoting Lisa, 940 F.2d at 44).

Here, the MRI and CT scan testing of Plaintiff's neck and upper back were not previously available. Although various practitioners ordered those examinations, Plaintiff was unable to undergo them because her workers' compensation refused to cover them. R. at 46, 248, 250, 258, 266, 271. Plaintiff thus could not have obtained this evidence earlier, and "[b]ecause the new evidence submitted by [Plaintiff] did not exist at the time of the ALJ's hearing, there is no question that the evidence is 'new' and that 'good cause' existed for her failure to submit this evidence to the ALJ." Pollard, 377 F.3d at 193.

### 2. The new evidence concerning Plaintiff's alleged spinal impairment is material.

Having shown that the medical evidence is new, not cumulative, and supported by good cause, the only remaining issue is whether the evidence is also "material." Evidence is material if it is (1) "relevant to the [Plaintiff]'s condition during the time period for which the benefits were denied" and (2) "probative." Pollard, 377 F.3d at 193 (quoting Tirado, 842 F.2d at 597). In addition, evidence is material if it is reasonably likely to have influenced the ALJ's consideration of Plaintiff's claim. See Pollard, 377 F.3d at 193 (noting that materiality requires "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently") (quoting Tirado, 842 F.2d at 597); see also id. at 194 (finding new evidence material that "might" have persuaded the ALJ that Plaintiff's limitations were more severe).

First, the evidence relating to Plaintiff's spinal injury is relevant to the time period for which benefits were denied. Evidence developed after the ALJ's decision can be relevant "if it shed[s] light on the seriousness of the [plaintiff's] condition at the time of the ALJ's decision." Mendez, 2013 WL 1686485 at *10 (citation omitted). Here, the medical evidence relating to Plaintiff's back injury plainly sheds light on the "severity and continuity of [plaintiff's preexisting] impairments" during the relevant period. Pollard, 377 F.3d at 193-94 (explaining that subsequent

evidence of the severity of a condition suggests that the condition may have been more severe in the past than previously thought); see also Williams v. Comm'r of Soc. Sec., 236 F. App'x 641, 644 (2d Cir. 2007); Lisa, 940 F.2d at 44; Corona v. Berryhill, No. 15-CV-7117 (MKB), 2017 WL 1133341, at *19-20 (E.D.N.Y. Mar. 24, 2017) ("The contents of the report are [ ] material and should not be precluded merely because the report was generated after, and is based in part on, treatment dates after the final ALJ decision.").

Indeed, the evidence informs the severity of Plaintiff's spinal impairments during the disability period and relates to the same back injury sustained by Plaintiff in 2015. The record reflects that Plaintiff repeatedly complained about neck and upper-back pain dating back to her workplace injury and throughout the relevant period, as well as at the hearing before the ALJ. See R. at 50 (Plaintiff testifying that her back pain "starts at the top of [her] neck and then [ ] goes down to the center of [her] back"); id. at 248 (Dr. Shein noting that at a September 2015 appointment, Plaintiff complained of pain in her neck); id. at 250 (Plaintiff complaining of ongoing severe pain in her neck at an October 2015 appointment); id. at 283 (Plaintiff reporting upper back and neck pain as a result of her workplace injury at a January 2016 appointment with Dr. Mathew); id. at 258 (Plaintiff reporting to Dr. Shein at an April 2017 appointment that her pain had spread from her upper back and neck to her mid-back).

Notably, Dr. Shein recommended and repeatedly requested tests on Plaintiff's cervical and thoracic regions. See R. at 250 (Dr. Shein noting in October 2015 that he wanted to examine cervical testing as soon as it became covered); id. at 266 (Dr. Shein requesting an MRI and X-ray of Plaintiff's cervical spine in January 2017); id. at 258 (Dr. Shein requesting an MRI of Plaintiff's thoracic spine in April 2017); id. at 271 (Dr. Shein requesting an MRI of Plaintiff's thoracic spine in July 2017). However, the record makes clear that such tests were not conducted because Plaintiff's workers' compensation only covered testing and treatment for her lumbar region. See R.

21

at 248 (Dr. Shein noting at a September 2015 appointment that Plaintiff's treatment was limited to her lower back because the workers' compensation case was "only open for the lumbar spine"); id. at 250 (Dr. Shein noting in October 2015 that cervical spine testing and treatment was not covered by worker's compensation); id. at 46 (Plaintiff's counsel stating that "[n]o one would approve the MRI of [Plaintiff's] thoracic spine" due to restrictions imposed by workers' compensation).

The Commissioner argues that the new evidence does not relate to Plaintiff's alleged disability because the testing and examinations "all were performed a year or more after the relevant period ended." Def.'s Opp'n. Br. at 7, ECF No. 44. But courts in this Circuit have consistently held that the fact that evidence first became available after the relevant period does not suffice to establish that the evidence does not relate to the claimant's condition during the relevant period. Santiago-Jimenez v. Comm'r of Soc. Sec., No. 15-CV-3884 (GBD) (JCF), 2016 WL 5942318, at *3 (S.D.N.Y. Oct. 13, 2016); see Pollard, 377 F.3d at 193-94 (finding that evidence generated after an ALJ's decision could not be deemed irrelevant solely because of the timing of its creation); Lisa, 940 F.2d at 44 (finding that a diagnosis that emerged after the close of administrative proceedings was material because it "shed[] considerable new light on the seriousness" of the claimant's condition); Williams, 236 Fed. App'x. at 644 (remanding case for consideration of medical report that post-dated the period for which benefits had been claimed); Melvin v. Barnhart, 02-CV-4527, 2004 WL 2591948 (GBD) (JCF), at *6-7 (S.D.N.Y. Nov. 8, 2004) (finding that report that post-dated ALJ decision by two years was new material evidence).

Second, the Commissioner also argues that the new evidence does not relate to Plaintiff's alleged disability because "nothing in the record states that the underlying findings existed during the relevant period." Def.'s Opp'n. Br. at 6-7. But, of course, the medical records before the ALJ could not have contained any mention of these new "underlying findings" because, as is documented in those records, Plaintiff never previously underwent an MRI or CT scan of her upper

22

back or neck (cervical and thoracic regions)—despite repeated complaints of pain in those areas—because those examinations were not covered by her insurance.

Turning to the probative value of the medical evidence, Plaintiff has demonstrated that the evidence is reasonably likely to have influenced the ALJ's consideration of Plaintiff's alleged disability. See Santiago-Jimenez, 2016 WL 5942318, at *3 (upholding remand for consideration of new evidence where court found that evidence "'might reasonably influence' the ALJ's disability determination"). Here, relying on the medical evidence available in the record at the time of the hearing, certain findings by the ALJ are contradicted by the new medical evidence relating to Plaintiff's cervical and thoracic regions. For example, in support of the contention that Plaintiff's spinal impairment did not meet the severity of the 1.04 listing, the ALJ stated that "[i]maging has shown no evidence of nerve root or spinal cord compression." R. at 24. Moreover, in evaluating the medical evidence and crafting the RFC, the ALJ determined that "[t]he objective evidence does not fully support the allegations of the claimant," in part, because "[t]here was no evidence of central canal stenosis or compression." R. at 26.

However, the new evidence includes an August 2021 MRI of Plaintiff's cervical region, which showed "moderate spinal canal stenosis," "degenerative disc desiccation," and "mass effect exerted on the ventral spinal cord." See MacAllister Decl., Ex. A at 19-20, 64-65. An MRI of Plaintiff's thoracic spine showed "[l]eft asymmetric posterior ligamentous hypertrophy at T10–T11, mildly narrowing the spinal canal and flattening the posterior lateral margin of the left hemicord." Id. at 21. Additionally, a September 2021 CT scan of Plaintiff's cervical spine showed "spinal canal stenosis" with "myelopathy" and "[m]ultilevel degenerative change." Id. at 16.[9] The

---

[9] Myelopathy is "an injury to the spinal cord due to *severe compression* that may result from trauma, congenital stenosis, degenerative disease or disc herniation." Myelopathy can occur in the cervical, thoracic, or lumbar region. See https://www.hopkinsmedicine.org/health/conditions-and-diseases/myelopathy (emphasis added).

new evidence suggests, contrary to the ALJ's decision, that Plaintiff did have spinal canal stenosis and myelopathy (spinal compression), and those diagnoses could have reasonably influenced the ALJ's consideration of Plaintiff's claim. See Lisa, 940 F.2d at 44 (finding new evidence "would present a reasonable possibility of influencing the Secretary to decide [the plaintiff's] application differently," and "would suggest that [Plaintiff] had an impairment substantially more severe than was previously diagnosed"); Garcia v. Colvin, No. 12-CV-4965 (DLI), 2014 WL 1311938, at *8 (E.D.N.Y. March 27, 2014) ("[I]t is reasonable to assume that a more developed record, based on the newly submitted evidence that could address the Plaintiff's condition during the relevant time period, would affect the Commissioner's decision.").

Furthermore, in her determination, the ALJ noted that Plaintiff claims to "experience[ ] severe pain *from her neck to her lower back*," R. at 26 (emphasis added). But the ALJ nevertheless determined that based on the evidence in the record, Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [were] only partially consistent with the entire record." Id.. And, in denying Plaintiff's claim, the ALJ found that Plaintiff suffered only from a severe impairment to her lumbar region—namely, "lumbar facet arthropathy with lumbar straightening." R. at 23.  The new evidence pertaining to Plaintiff's cervical and thoracic regions substantiates Plaintiff's claim of pain in her neck and upper-back. It further informs a determination as to the severity, frequency, and limiting effects of Plaintiff's injury and provides new objective medical evidence relating to Plaintiff's cervical and thoracic regions, suggesting that Plaintiff might have been suffering from a substantially more severe spinal impairment than initially presented to the ALJ. See Pollard, 377 F.3d at 193-94 (finding that new evidence was material where the records directly supported many of Plaintiff's earlier contentions); Williams, 236 Fed. App'x. at 644 (finding that new evidence was probative and material because it countered the ALJ's finding of insufficient evidence to support plaintiff's allegations of incapacitating pain).

24

In sum, because the new medical evidence concerning Plaintiff's upper back and neck relate to the same spinal injury and the existing record lacked such evidence, its inclusion "might reasonably influence" the ALJ's disability determination. See Santiago-Jimenez, 2016 WL 5942318, at *3. On remand, the Commissioner should consider this new evidence in conjunction with the existing administrative record. See Pollard, 377 F.3d at 193 (citing Shalala v. Schaefer, 509 U.S. 292, 297 n.2 (1993)). Additionally, at the new hearing, Plaintiff is free to present to the ALJ her evidence relating to her alleged psychiatric impairments, including her mental-health treatment and diagnoses.

## **CONCLUSION**

For the foregoing reasons, the Plaintiff's motion to remand is **GRANTED**. The Commissioner's motion for judgment on the pleadings is **DENIED**. The case is **REMANDED** to the Commissioner for further proceedings consistent with this decision. The Clerk of Court is directed to terminate the motions at ECF Nos. 22 and 38.

DATED:      December 5, 2022
            New York, New York

Respectfully submitted,

_____
VALERIE FIGUEREDO
United States Magistrate Judge

Copies to:

All counsel (via ECF)

25